IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


BNSF RAILWAY COMPANY, a                    08-CV-415-BR
Delaware corporation,

          Plaintiff,                       OPINION AND ORDER

v.

ALBANY & EASTERN RAILROAD
COMPANY, an Oregon
corporation, and MICHAEL R.
ROOT, an individual,

          Defendants.


DAVID PATRICK MORRISON
KIMBERLY R. GRIFFITH
Cosgrave Vergeer Kester, LLP
805 S.W. Broadway
Eighth Floor
Portland, OR 97205
(503) 323-9000


1 - OPINION AND ORDER

**TIMOTHY R. THORNTON**
**ARTHUR L. BROWN**
Briggs and Morgan, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 977-8850

       Attorneys for Plaintiff

**WILLIAM N. MEHLHAF**
**STACY R. OWEN**
Markowitz Herbold Glade & Mehlhaf, PC
1211 S.W. Fifth Avenue
Suite 3000
Portland, OR 97204
(503) 295-3085

       Attorneys for Defendants


**BROWN, Judge.**

    This matter comes before the Court on the Motion (#81) for [Partial] Summary Judgment of Plaintiff BNSF Railway Company, the Motion (#85) for [Partial] Summary Judgment of Defendants Albany & Eastern Railroad Company (AERC) and Michael R. Root,[1] and the Motion (#105) of BNSF to file a Third Amended Complaint.

    For the reasons that follow, the Court **GRANTS** BNSF's Motion for [Partial] Summary Judgment, **GRANTS** Defendants' Motion for [Partial] Summary Judgment, and **DENIES** BNSF's Motion to File a Third Amended Complaint.

--------

    [1] Both parties title their Motions as "Motion for Summary Judgment."  The Court notes, however, neither Motion disposes of all of the claims of either party.  Accordingly, the Court construes both Motions as motions for partial summary judgment.

2 - OPINION AND ORDER

## BACKGROUND

On April 3, 1998, BNSF entered into an agreement with AERC[2]

to convey to AERC "certain assets, rights, and obligations" of

BNSF including:

> (a)  Seller's interest in all rail, ties,
> spikes, tie plates, rail anchors, turnouts,
> culverts, signaling equipment, and other
> supporting structures, ballast, other track
> materials  and supplies . . . that on the date of
> Closing constitute all railroad tracks, track
> materials and related track structures and
> facilities that could be used to provide rail
> service . . . which are located on the Rail
> Corridor, as defined in Paragraph l(b)
> of this Agreement, and constitute portions of the
> following rail·line segment of Seller:

> Lebanon, OR (MP 14.50) to Foster, OR (MF
> 31.90).

> * * *

> The rail line segment, exclusive of any interest
> in the underlying or adjacent rail corridor real
> estate, is referenced herein as "Property". . . .
> The rail line segment is referenced herein as
> "Rail Line."

> (b)  a permanent and exclusive rail service
> easement over all real property interests of
> Seller in real estate that is located between the
> endpoint mileposts of the rail line segment
> identified as the Property, and also within 50
> feet of either side of the centerline of the
> tracks (including any siding) that comprise the
> rail line segment identified as the Property
> . . . .  The real estate Subject to this Easement,
> as described in the preceding sentence, shall be
> referenced in the aggregate herein as "Rail
> Corridor."  The easement rights conveyed to Buyer

---

[2] At the time of the Agreement, AERC's sole shareholder was
Defendant Root's brother.

shall be only:  the right to operate rail service
over the Rail Line.

* * *

    (c)  . . . . overhead trackage rights to
operate over Seller's rail line between MP 0.0 at
Albany, Oregon and MP 0.89 east of Albany, Oregon,
and over Seller's yard tracks in its Albany,
Oregon, rail yard, for the sole purpose of
interchanging cars with Seller.  This rail line
segment shall be referenced hereinafter as
"Trackage Rights Line".  Buyer shall operate its
trains over the Trackage Rights Line subject to
Seller's dispatching directions, and shall
interchange all rail traffic between Buyer and
Seller at Seller's Albany yard.  There shall be no
charge to Buyer for these trackage rights.

    (d)  . . . . the right to conduct rail
freight transportation business on the Rail Line,
subject to the terms and conditions set forth in
this Agreement, the Easement, the Bill of Sale
and/or any agreement assigned by Seller to Buyer
by the terms of this Agreement.

    (e)  . . . . all of Seller's rights to
operate trains over trackage owned by Union
Pacific Railroad Company ("UP") between Albany and
Lebanon, Oregon, which operations are conducted by
Seller pursuant to a trackage rights agreement
dated October 1, 1985.

Aff. of Arthur L. Brown, Ex. 3 at 2-4.

    Section 2(c) of the Agreement contains a provision for

liquidated damages, which provides in pertinent part:

        (c)  Because the consideration for the Rail
    Line does not include the franchise value and
    going concern value to Seller of the rail
    transportation business to and from the Rail Line,
    Buyer shall pay to Seller, as liquidated damages,
    $2,000 per car for each loaded car which
    originates or terminates at any facility along the
    Rail Line which is not as of the date of Closing
    open to rail service by carriers other than

> Seller, and which is interchanged by Buyer at any
> point upon along the Rail Corridor with any
> railroad other than Seller.  This charge shall be
> paid monthly, within 15 days of the end of each
> month, Buyer shall submit a report to Seller
> monthly, within 10 days of the end of each month,
> identifying and quantifying all loaded cars which
> moved to or from points along the Rail Corridor
> that were interchanged between Buyer and carriers
> other than Seller during the prior month.

Brown Aff., Ex. 3 at 8.

In November or December 1998 Defendant Root acquired AERC
from his brother.

On October 23, 2002, BNSF entered into a lease with Portland
& Western Railroad (PNWR) effective January 1, 2002, in which
PNWR assumed operation of BNSF's rail line between Quinaby,
Oregon, and Eugene, Oregon, including BNSF's rail yard in Albany,
Oregon.

Union Pacific Railroad (UP) also has a rail yard in Albany,
Oregon.  Due to the configuration of the Albany yard and AERC's
rail line before BNSF leased "trackage" to PNWR, AERC's trains
had to move into the UP yard when AERC brought trains to Albany.
AERC also had to obtain permission from UP to move through UP's
Albany yard and across UP's line to deliver the traffic to BNSF's
yard.  PNWR, however, obtained traffic rights from UP so that
AERC no longer needed to cross the UP line.  AERC, therefore, can
now "hand off" BNSF traffic to PNWR in the UP yard, and PNWR then
delivers the cars to BNSF in Vancouver.  Brown Aff., Ex. 4 at
¶ 12.

5 - OPINION AND ORDER

On November 26, 2002, AERC commenced arbitration against BNSF before the Surface Transportation Board (STB).  AERC requested the arbitrator to suspend the "paper barrier"[3] resulting from the AERC/BNSF Agreement so that AERC could interchange the traffic that originated at Sweet Home, Oregon, and Bauman, Oregon, with UP at the Albany rail yard without paying the $2,000 per car required in § 2(c) of the Agreement.

In December 2002 after AERC and BNSF filed their briefs and submitted their principal evidence with the arbitrator, AERC sought to dismiss the arbitration voluntarily and without prejudice.  Because BNSF and AERC ultimately agreed to dismissal of the arbitration with prejudice, the STB arbitrator dismissed the arbitration on December 18, 2002.  On January 12, 2004, the STB issued an order confirming the arbitrator's decision.

In September 2007 Defendant Root sold AERC to Rick Franklin Corporation (RFC).  RFC continued to operate AERC and to conduct short-line rail operations pursuant to the terms of AERC's Agreement with BNSF.

---

[3] "Paper barrier" denotes a transaction typically between a large railroad and a small railroad in which the small railroad handles the origination or termination of traffic on a branch (short) line and the large railroad handles the "long-haul" portion of the rail movement.  A paper barrier limits the ability of the short-line carrier to interchange traffic with a long-haul railroad other than the large railroad selling or leasing the branch line.  When BNSF and AERC entered into the 1998 Agreement, it became physically possible for AERC to interchange traffic at the Albany rail yard directly with both BNSF and UP, but § 2(c) of the Agreement prohibited AERC from interchanging with UP.

On October 9, 2007, AERC General Manager David Farrell "noticed some waybills" in which "the product was coming out of Sweet Home, but the waybills were waybilled out of Lebanon."[4]  A waybill is

> a document normally prepared by the customer (shipper) authorizing the railroad(s) to move a railcar.  Information normally included on the waybill [includes] . . . the origin loading and destination stations. . . .  The waybill is used for preparation of the freight bill (customer invoice) . . . . [and] is delivered electronically to each railroad involved with the movement.

Brown Aff., Ex. 2.  Ultimately Farrell contacted Weldon E. Hale, BNSF Director of Shortline Development about the waybills for products coming out of Sweet Home that were waybilled out of Lebanon.  In response to Farrell's inquiry, BNSF conducted an audit of AERC's records.

On November 1, 2007, as a result of the audit, Hale advised Rick Franklin, President of RFC, that

> AERC has in fact interchanged traffic to a railroad other than BNSF which originated or terminated at a facility that is not open to rail service from that other railroad.  In all, a total of 428 cars were found to have been interchanged to a carrier other than BNSF for which liquidated damages were not paid [between July 1, 2004, and October 9, 2007].  A total of $974,910.64 is owed BNSF by AERC for these 428 cars.

---

[4] Sweet Home is a facility that was not open to rail service from a carrier other than BNSF before BNSF entered into the Agreement with AERC.  Lebanon, however, is a facility that was open to rail service from carriers other than BNSF before the Agreement.

Brown Aff., Ex. 8.

On April 2, 2008, BNSF filed this action against AERC alleging claims for breach of contract and fraud.  On May 13, 2008, BNSF filed a First Amended Complaint to allege an additional claim for deceit on the ground that "AERC failed to disclose that cars originating or terminating at a facility, which before the sale were only open to rail service from BNSF, were being interchanged to another railroad."  On October 28, 2008, AERC moved for summary judgment.  On February 5, 2009, the Court heard oral argument on AERC's Motion and denied it for the reasons indicated on the record.

On March 20, 2009, Plaintiff filed a Second Amended Complaint to assert claims against Michael Root for misrepresentation/piercing the corporate veil and fraud.  On April 3, 2009, Defendants filed an Answer in which they alleged nine Affirmative Defenses (failure to state a claim, waiver, estoppel, statute of limitations, illegality, impossibility of performance, unlawful penalty provision, frustration of purpose, and material breach of contract) and five Counterclaims for declaratory relief (illegal tying arrangement, unlawful penalty provision, frustration of purpose, impossibility of performance, and material breach of contract).

On February 1, 2010, BNSF moved for summary judgment as to all of Defendants' Affirmative Defenses and Counterclaims.  Also

on February 1, 2010, Defendants moved for summary judgment as to BNSF's fraud claims against AERC and Root.

On July 7, 2010, the Court heard oral argument on the parties' Motions, directed BNSF to file a statement clarifying the Affirmative Defenses and Counterclaims against which it seeks summary judgment, and directed the parties to file further briefing as to BNSF's fraud claim against Root.

On July 16, 2010, BNSF filed a Motion to File Third Amended Complaint.

## STANDARDS

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. *Id.*

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Id.*  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."  *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

A mere disagreement about a material issue of fact, however, does not preclude summary judgment.  *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary."  *Wong v. Regents of Univ. of Cal.*, 379 F.3d 1097 (9th Cir. 2004), *as amended by* 410 F.3d 1052, 1055 (9th Cir. 2005) (citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id.*


### PLAINTIFF BNSF'S MOTION FOR [PARTIAL] SUMMARY JUDGMENT

On July 14, 2010, BNSF filed a Listing of Affirmative

Defenses and Counterclaims in which it advised the Court that it seeks summary judgment as to all of Defendants' Counterclaims and as to the following Affirmative Defenses:  illegality, impossibility of performance, unlawful penalty provision, frustration of purpose, and material breach of contract.  BNSF indicated it does not seek summary judgment as to Defendants' Affirmative Defenses of failure to state a claim, waiver, estoppel, or statute of limitations.  Accordingly, BNSF only seeks summary judgment as to the Affirmative Defenses and Counterclaims in which Defendants seek declarations that (1) § 2(c) of the Agreement is an illegal tying arrangement in violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1; (2) § 2(c) of the Agreement is an unlawful penalty provision rather than a liquidated-damages provision; (3) AERC's obligations under § 2(c) of the Agreement were extinguished by the doctrine of frustration of purpose; (4) AERC's obligations under § 2(c) of the Agreement were extinguished by the doctrine of impossibility of performance; and (5) AERC's obligations under § 2(c) of the Agreement were excused due to BNSF's material breach of the Agreement.

BNSF moves for summary judgment on the grounds that (1) all of Defendants' Counterclaims and Affirmative Defenses moved against by BNSF are barred by *res judicata*; (2) Defendants' Affirmative Defenses and Counterclaims for violations of the

11 - OPINION AND ORDER

Sherman Act and unlawful penalty are preempted by the Interstate Commerce Commission Termination Act of 1995 (ICCTA), 49 U.S.C. § 10501(b); and (3) Defendants have not established genuine issues of material fact preclude summary judgment.

I.    *Res Judicata*[5] **as to Defendants' Affirmative Defenses and Counterclaims moved against by BNSF.**

BNSF contends Defendants could have brought the Affirmative Defenses and Counterclaims moved against by BNSF as part of the STB arbitration, and, therefore, Defendants are foreclosed from litigating their Affirmative Defenses and Counterclaims now. According to BNSF, those Affirmative Defenses and Counterclaims are barred by *res judicata* because BNSF challenged "the interchange commitment embodied in Section 2(c)" in the 2004 arbitration before the STB, the pertinent Affirmative Defenses and Counterclaims relate to that issue, and the arbitration was dismissed with prejudice.

Defendants, in turn, contend their Affirmative Defenses and Counterclaims are not barred by *res judicata*.  According to Defendants, they could not have raised these issues in the arbitration and the arbitrator did not reach the merits of the

_____

[5] Although the parties refer to this doctrine as *res judicata*, courts now often refer to it as claim preclusion.  *See Cell Therapeutics, Inc. v. Lash Group, Inc.*, No. 08-35619, 2010 WL 22686, at *8 (9th Cir. Jan. 6, 2010)("Claim preclusion, often referred to as *res judicata*, bars any subsequent suit on claims that were raised or could have been raised in a prior action."). For purposes of clarity, the Court will refer to the doctrine as *res judicata*.

issues.

**A.    Federal law applies.**

When a party invokes *res judicata* as to an order issued by a federal court, federal law applies.  *See, e.g., Acceptance Ins. Co. v. Am. Safety Risk Retention Group, Inc.*, Civil No. 08cv1057-L(WMc), 2010 WL 744291, at *2 (S.D. Cal. Mar. 3, 2010) (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481-82 (1982)).  The STB is a federal agency created by Congress in 1996.  BNSF, therefore, contends the federal law of *res judicata* applies.  Defendants conceded the issue at oral argument, and the Court agrees.  Accordingly, this Court applies federal law to the issue of the preclusive effect, if any, of the STB's dismissal of the arbitration with prejudice.

**B.    *Res judicata* standard.**

"Res judicata, or claim preclusion, 'bars any lawsuits on any claims that were raised or could have been raised in a prior action.'"  *F.T.C. v. Garvey,* 383 F.3d 891, 897 (9th Cir. 2004)(quoting *Providence Health Plan v. McDowell*, 361 F.3d 1243, 1249 (9th Cir. 2004)).  *Res judicata* has the effect of "foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit."  *Gospel Missions of Am. v. City of Los Angeles,* 328 F.3d 548, 553 (9th Cir. 2003)(citing *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 77 n.1 (1984)).

The doctrine is applicable whenever there is "(1) an identity of claims, (2) a final judgment on the merits, and (3) identity of parties or privity between parties." *Owens,* 244 F.3d at 713.

An identity of claims exists when the two actions "arise out of the same transactional nucleus of facts." *Id.* at 714. "'Privity' is a legal conclusion 'designating a person so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved." *F.T.C.,* 383 F.3d at 897 (quoting *Schimmels v. United States,* 127 F.3d 875, 881 (9th Cir. 1997)).

It is undisputed that the parties to this action are in privity with the parties to the STB arbitration and that the claims here arise out of the same "transactional nucleus of fact." At issue is whether the dismissal with prejudice in the STB arbitration is a final decision on the merits for purposes of *res judicata* and whether Defendants could have brought before the STB the Affirmative Defenses and Counterclaims moved against by BNSF.

**C.    The STB dismissal of the arbitration with prejudice was a final decision on the merits for purposes of *res judicata.***

Although AERC sought voluntary dismissal of the STB arbitration in December 2002, BNSF and AERC ultimately agreed to a dismissal with prejudice. As noted, on December 18, 2002, the STB arbitrator dismissed the arbitration between AERC and BNSF

with prejudice and on January 12, 2004, the STB issued an order
confirming its decision.

It is undisputed that the arbitrator and the STB did
not address the merits of the arbitration before they dismissed
the arbitration with prejudice.  Because the arbitrator did not
reach the merits, Defendants contend the STB dismissal with
prejudice does not preclude Defendants from bringing their
Affirmative Defenses and Counterclaims in this action.

The Ninth Circuit has held

> [a]n arbitration decision can have *res judicata* or
> collateral estoppel effect . . . .  *C.D. Anderson
> & Co., Inc. v. Lemos*, 832 F.2d 1097, 1100 (9th
> Cir. 1987).  In applying *res judicata* and
> collateral estoppel to an arbitration proceeding,
> we make an examination of the record, if one
> exists, including any findings of the arbitrators.
> *See, e.g., Emich Motors Corp. v. General Motors
> Corp.*, 340 U.S. 558, 569, 71 S. Ct. 408, 414, 95
> L. Ed. 534 (1950).  We must decide whether a
> rational factfinder could have reached a
> conclusion based upon an issue other than that
> which the defendant seeks to foreclose.  *See Ashe
> v. Swenson*, 397 U.S. 436, 444, 90 S. Ct. 1189,
> 1194, 25 L. Ed.2d 469 (1970).
>
> * * *
>
> The party asserting preclusion bears the burden of
> showing with clarity and certainty what was
> determined by the prior judgment.  *United States
> v. Lasky*, 600 F.2d 765, 769 (9th Cir.), *cert.
> denied*, 444 U.S. 979, 100 S. Ct. 480, 62 L. Ed.2d
> 405 (1979).  "It is not enough that the party
> introduce the decision of the prior court; rather,
> the party must introduce a sufficient record of
> the prior proceeding to enable the trial court to
> pinpoint the exact issues previously litigated."
> *Id*.  Where the record before the district court
> was inadequate for it to determine whether it

> should apply the doctrine of collateral estoppel,
> we will not consider the issue on appeal. *Id.*
> *See also Hernandez v. City of Los Angeles*, 624
> F.2d 935, 937 (9th Cir. 1980).

*Clark v. Bear Stearns & Co., Inc.*, 966 F.2d 1318, 1321 (9th Cir. 1992).  *See also Rachford v. Air Line Pilots Ass'n, Intern.*, No. 06-16938, 2008 WL 2607949, at *1 (9th Cir. July 2, 2008) (same).

In support of its assertion that *res judicata* bars the pertinent Counterclaims and Affirmative Defenses, Defendants produced AERC's arbitration complaint, AERC's Opening Statement, BNSF's Response and Evidence, and the STB order dismissing the arbitration with prejudice.  The Court concludes BNSF has offered a sufficient record of the STB proceeding to enable the Court "to pinpoint the exact issues previously litigated" and to "decide whether a rational factfinder could have reached a conclusion based upon an issue other than that which the [D]efendant[s] seek[] to foreclose."

Accordingly, the Court concludes on this record that the STB's dismissal of the arbitration with prejudice constitutes a final decision on the merits for purposes of *res judicata* even though the STB did not reach the merits of the parties' claims before dismissal.

**D. The STB arbitration decision has *res judicata* effect as to four of Defendants' Affirmative Defenses and four of Defendants' Counterclaims at issue.**

In its complaint before the STB, AERC sought a ruling suspending the paper barrier contained in § 2(c) of the Agreement "so that AERC and UP can interchange the new traffic at Albany, Oregon without penalty." Brown Aff., Ex. 12 at 19. In its Opening Statement, AERC described the issue as follows:

> The Arbitrator is asked to determine whether or not the paper barrier in the Sale Agreement should be suspended to permit AERC to interchange with UP at Albany, OR, limited to traffic originating at a new wood planer on the Lebanon-Foster rail line at Bauman, OR, and at a formerly dormant sawmill on that line at Sweet Home, OR, destined to points in the 1-5 corridor served solely by UP.

Brown Aff., Ex. 12 at 32. AERC asserted the traffic involved in the requested suspension was new traffic, and BNSF either "cannot or will not participate in the new traffic." Even though AERC raised only the issue of suspension of § 2(c) in the arbitration, Defendants have not established any reason why AERC could not have raised the issues of impossibility of performance, frustration of purpose, breach of contract, and unlawful penalty provision in the context of arbitrating the suspension of § 2(c).[6] Each of these issues relates directly to the same facts and the same types of transactions as those at issue in the STB arbitration.

---

[6] The Court addresses Defendants' antitrust Affirmative Defense and Counterclaim in section II of this Opinion and Order.

17 - OPINION AND ORDER

The Court, therefore, concludes on this record that Defendants' Counterclaims and Affirmative Defenses for impossibility of performance, frustration of purpose, breach of contract, and unlawful penalty provision are barred by *res judicata*.  Accordingly, the Court grants BNSF's Motion for [Partial] Summary Judgment as to these Affirmative Defenses and Counterclaims.

## II.  Defendants' antitrust Affirmative Defense and Counterclaim

### A.  Defendants' antitrust Affirmative Defense and Counterclaim are not barred by *res judicata*.

In their Amended Answer to BNSF's Second Amended Complaint, Defendants bring the following Affirmative Defense:

> 55.
> Plaintiff is prevented from pursuing a breach of the Agreement by virtue of the doctrine of illegality, because section 2(c) of the Agreement provides for an illegal tying arrangement in violation of section 1 of the Sherman Anti-Trust Act (15 U.S.C. § 1).

Defendants also bring the following Counterclaim:

> 78.
> Section 1 of the Sherman Anti-Trust Act (15 U.S.C. § 1)(the "Act") prohibits contracts in restraint of trade.

> 79.
> Under the Act, an illegal tying arrangement is an agreement where one party agrees to sell to another on the condition that the buyer also purchases a tied product.

> 80.
> Section 1 of the Agreement provided for the sale by plaintiff of its Rail Line to AERC and that AERC interchange all rail traffic between AERC and

BNSF at BNSF's Albany yard, notwithstanding that
UP competed with plaintiff and also operated to
and from the Albany yard.  Further, section 2(c)
of the Agreement prohibited AERC from
interchanging with any other railroad other than
plaintiff along the Rail Corridor.  These
restrictions constitute a tying arrangement in
violation of section 1 of the Sherman Act (15
U.S.C. § 1).

81.

Defendants are entitled to a judicial declaration
of the rights and responsibilities of the parties
under the Agreement, including a declaration that
section 2(c) of the Agreement is illegal, and
therefore void and unenforceable.

Defendants assert the STB lacks the authority to

determine whether antitrust laws have been violated or to enforce

antitrust laws.  Thus, Defendants contend they could not have

brought their Affirmative Defense and Counterclaim for violations

of the Sherman Act in the STB arbitration, and, therefore, that

Affirmative Defense and that Counterclaim are not barred by *res

judicata*.  Defendants rely on *Delaware and Hudson Ry. Co. v.

Consolidated Rail Corp.* (*DHRC*), 654 F. Supp. 1195 (N.D.N.Y.

1987), to support their position.

In *DHRC*, the plaintiff rail carrier brought an action

against the defendant rail carrier alleging the defendant's joint

rate cancellations and increased reciprocal switching charges "in

the aggregate demonstrated" the defendant's monopolization or

attempted monopolization of the relevant market in violation of

§ 2 of the Sherman Act.  The defendant moved to dismiss the

plaintiff's claims on the basis of primary jurisdiction of the
Interstate Commerce Commission (the predecessor of the STB).  654
F. Supp. at 1199-1200.  The court denied the defendant's motion
on the ground that:

> Although the ICC may consider antitrust principles
> in its determinations, the agency lacks authority
> to enforce the antitrust laws or even determine if
> they have been violated. *Transkentucky*, 581 F.
> Supp. at 767, (citing *McKlean Trucking Co. v.
> United States*, 321 U.S. 67, 79, 64 S. Ct. 370,
> 376, 88 L. Ed. 544 (1944)).

*Id*. at 1202.

BNSF, however, asserts the STB may consider and resolve
antitrust issues, and, in fact, it has already done so in STB *Ex
Parte No. 575*.  Thus, BNSF contends Defendants could have brought
their antitrust Affirmative Defense and Counterclaim in the STB
arbitration.

*Ex Parte* 575 was a legislative rulemaking in which the
Western Coal Traffic League (WCTL) asked the STB to enact "rules
of general applicability regarding so-called 'paper barriers.'"
Specifically, WCTL asked the STB to

> establish a rebuttable presumption that such
> [paper barriers are] unreasonable and contrary to
> the public interest if [they] (a) last[] longer
> than 5 years, (b) include[] any financial penalty
> for interchanging traffic with another carrier, or
> (c) include[] a credit for interchanging traffic
> with the seller or lessor railroad that would
> provide a return in excess of the railroad
> industry's cost of capital.

*Ex Parte 575, Review of Rail Access and Competition Issues*, 2007

WL 3170981, at *1 (STB 2007).  The STB declined to enact the rule proposed by the WCTL, which would have prohibited the paper barriers described "across the board."  *Id.*, at *10.  In doing so, the STB rejected the WCTL's contention that paper barriers of the kind set out by the WCTL are anticompetitive and contrary to the public interest.  *Id.*, at *7-9.  Although the STB referenced antitrust law generally in its analysis, it merely "consider[ed] antitrust principles in [making] its determination[]" as permitted by *McKlean Trucking.*  The STB did not analyze or determine whether the noted paper barriers violated antitrust laws.  Thus, *Ex Parte 575* does not establish the STB has decided antitrust issues or that it has the authority to enforce antitrust laws or to determine whether antitrust laws have been violated.

The Court finds the *DHRC* court's reasoning to be persuasive.  Thus, the Court concludes on this record that BNSF has not established Defendants could have brought their antitrust Affirmative Defense and Counterclaim in the STB arbitration, and, therefore, Defendants' antitrust Affirmative Defense and Counterclaim are not barred by *res judicata.*

**B.   Defendants' antitrust Affirmative Defense and Counterclaim are not preempted by the ICCTA.**

BNSF also moves for summary judgment as to Defendants' antitrust Affirmative Defense and Counterclaim on the ground that they are preempted by the ICCTA.

21 - OPINION AND ORDER

The ICCTA (sometimes referred to as the Staggers Act), 49 U.S.C. § 10501(b), provides:

> (b)  The jurisdiction of the [STB] over—
>
> (1)  transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2)  the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

According to BNSF, the STB has the power to "excuse" or to exempt transactions from § 10501(b).  When the STB does so, the excused/exempted transaction is precluded from all regulatory constraints, "whatever the source."  BNSF asserts regulatory constraints in this context include judicial remedies "against" exempted transactions because permitting a judicial remedy against an exempted transaction "would have the effect of substituting a court's regulation for the [STB's] decision in favor of deregulation."

It is undisputed that on May 14, 1998, the STB exempted the rail line sale transaction that is the subject of the Agreement here.  According to BNSF, therefore, the transaction at

22 - OPINION AND ORDER

issue may not be "regulatorily constrained" in any way, including by a judicial remedy.  Thus, because Defendants' antitrust Affirmative Defense and Counterclaim "would effect a judicial remedy" that would constrain the transaction, they are preempted by the ICCTA.  BNSF relies on *G.&T. Terminal Packaging Co., Inc. v. Consolidated Rail Corp.*, 830 F.2d 1230 (3d Cir. 1987), and *Alliance Shippers, Inc. v. Southern Pacific Transp. Co.*, 858 F.2d 567 (9th Cir. 1988), to support its contention.

In  *G.&T. Terminal Packaging,* the plaintiffs, rail shippers of agricultural commodities, were served by the defendant railroad who delivered rail-car shipments of various commodities to the plaintiffs at various stations.  At some point the ICC (predecessor of the STB) exempted the rates for rail transportation of the commodities at issue from the ICCTA.  830 F.2d at 1231-32.  The defendant then began to impose a $500-600 per car surcharge on all rail-car shipments to the plaintiffs. The plaintiffs brought an action in federal court alleging claims for violations of the ICCTA, common law, antitrust laws, and the United States Constitution.  *Id*. at 1232.  The parties dismissed the antitrust claim by stipulation, the district court held the plaintiffs' common-law claims were preempted, and the district court dismissed the plaintiffs' constitutional and ICCTA claims. *Id*. at 1233.  The Third Circuit affirmed and held the plaintiffs' "common law claims, whether considered as arising under state or

federal common law, are preempted" by the ICCTA.  *Id*. at 1235.

The court reasoned:

> [A]n interpretation which viewed exempted rates as
> removed from the jurisdiction of the Commission
> would be inconsistent with the statutory scheme,
> which provides for the Commission's ongoing
> jurisdiction over exempt traffic.  49 U.S.C.
> § 10505(d) permits revocation by the Commission of
> exemption where necessary to carry out the
> transportation policy of the Act. . . .  The
> ongoing jurisdiction to reconsider the exemption
> in light of competitive conditions is conferred in
> the first instance on the Commission, not on the
> courts.  Recognition of a common law remedy with
> respect to rates would have the effect of
> substituting a court's regulation for the
> Commission's decision in favor of deregulation.

*Id*. at 1234-35.

In *Alliance Shippers, Inc.*, the plaintiff was a
shipping agent "engaged in the business of assembling truckload
shipments from various shippers and arranging transportation for
these shipments to their destinations."  In the course of its
business, the plaintiff purchased "trailer-on-flatcar (TOFC)"
service from railroads such as the defendant.  At some point the
ICC exempted TOFC service from regulation pursuant to 49 U.S.C.
§ 10505.  The plaintiff discovered other shipping agents were
receiving more favorable rates from the defendant and filed an
action alleging federal common-law and state statutory price-
discrimination claims as well as federal and state antitrust
claims.  858 F.2d at 568.  The district court concluded the
plaintiff's federal and state-law claims for price discrimination

were preempted by the ICCTA and that the plaintiff failed to state a claim for antitrust violations. *Id*. The Ninth Circuit, relying on *G.&T. Terminal Packaging,* affirmed the district court's decision as to the plaintiff's federal price-discrimination claim on the ground that "allowing a common law remedy for discrimination in rates for providing exempted services would have the effect of substituting a court's regulation for the Commission's decision in favor of deregulation and would be contrary to the language, purpose, and expressed intent of Congress." *Id*. at 569 (quotation omitted). The Ninth Circuit also affirmed the district court's decision as to the plaintiff's state price-discrimination claim on the ground that the ICCTA "does not permit state remedies and § 10501 expressly preempts state statutory remedies." *Id*. at 569-70. Never-theless, the Ninth Circuit also concluded the plaintiff's "[a]ntitrust remedies unquestionably survived deregulation. Indeed the availability of antitrust remedies was a motivating factor in ICC's decision to exempt TOFC services." *Id*. at 570. The Ninth Circuit held the plaintiff had not stated a claim for antitrust violations. *Id*.

As noted, in *G.&T. Terminal Packaging* the parties agreed to dismissal of the plaintiffs' antitrust claim and in *Alliance Shippers* the court specifically concluded the plaintiff's antitrust remedy was not preempted. These cases,

therefore, do not support BNSF's contention that Defendants' antitrust Affirmative Defense and Counterclaim are preempted by the ICCTA.

In addition, the STB's interpretation of the preemption power of § 10501(b) is as follows:

> [A]lthough a literal reading of section 10501(b) might suggest that it supersedes other federal law, the Board and the courts have rejected such an interpretation as overbroad and unworkable. Instead, the Board and the courts have harmonized section 10501(b) with federal statutes. . . . *See, e.g., Tyrrell v. Norfolk S. Ry*, 248 F.3d 517, 523 (6th Cir. 2001).

*Csx Trans., Inc. - Pet. for Decl. Order*, STB Fin. Docket No. 34662, 2005 WL 584026, at *8 (STB Mar. 14, 2005).

Defendants point persuasively to a number of cases to support their assertion that despite its broad language, § 10501(b) does not preempt other federal statutes such as the Sherman Act.  *See, e.g., Ass'n of Am. R.R.s v. S. Coast Air Qual. Mgmt. Dist.*, 2007 WL 2439499, at *5 (C.D. Cal. Apr. 30, 2007) ("The District is correct that the ICCTA does not preempt the [Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*] . . . ."); *Borough of Riverdale - Pet. for Decl. Order*, 4 S.T.B. 380, 386 (1999) (nothing in 49 U.S.C. § 10501(b) is intended to interfere with the implementation of federal environmental statutes); *Auburn & Kent, WA--Pet. for Decl. Order--Stampede Pass Line*, 2 S.T.B. 330, 337 (1997)(same), *aff'd sub nom. City of Auburn v. U.S.*, 154 F.3d 1025 (9th Cir. 1998).  Defendants also rely on the following

26 - OPINION AND ORDER

legislative history of § 10501(b):  "[C]riminal statutes governing antitrust matters [are] not preempted by this Act [and] . . . remain fully applicable unless specifically displaced, because they do not generally collide with the scheme of economic regulation (and deregulation) of rail transportation."  H.R. Conf. Rep. No. 422, 104th Cong. 1st Sess. 167 (1995), reprinted in 1995 U.S.C.C.A.N 850, 852.

The Court adopts the STB's interpretation of § 10501 and the reasoning of the cases cited by Defendants as well as *G.&T. Terminal Packaging* and *Alliance Shippers* and concludes Defendants' antitrust Affirmative Defense and Counterclaim are not preempted by § 10501.

**C.  Defendants fail to establish a genuine issue of material fact exists as to their antitrust Affirmative Defense and Counterclaim.**

Finally, BNSF contends Defendants fail to establish a genuine issue of material fact exists as to their antitrust Affirmative Defense and Counterclaim, and, therefore, BNSF is entitled to summary judgment.

As noted, Defendants seek a declaration that § 2(c) of the Agreement is illegal and unenforceable under the Sherman Act, 15 U.S.C. § 1, because, according to Defendants, it is a *per se* "illegal tying arrangement . . . [that] is imposed by a seller with monopoly power over railroad facilities in its region (the tying product), and railroad traffic (the tied product)."  In the

27 - OPINION AND ORDER

alternative, Defendants contend even if § 2(c) does not violate
the Sherman Act *per se*, it still violates § 1 of the Sherman Act
because its "indefinite duration would violate the antitrust
laws."

**1.   The law related to *per se* illegal tying
arrangements.**

The Sherman Act provides in pertinent part:
"Every contract, combination in the form of trust or otherwise,
or conspiracy, in restraint of trade or commerce among the
several States, or with foreign nations, is declared to be
illegal."  15 U.S.C. § 1.

The Ninth Circuit has held § 1

> can be violated by tying two products or
> services together, whereby "the seller
> conditions the sale of one product (the tying
> product) on the buyer's purchase of a second
> product (the tied product)."  *Cascade Health
> Solutions v. PeaceHealth,* 515 F.3d 883, 912
> (9ᵗʰ Cir. 2008).  "Tying arrangements are
> forbidden on the theory that, if the seller
> has market power over the tying product, the
> seller can leverage this market power through
> tying arrangements to exclude other sellers
> of the tied product."  *Id.*

*Blough v. Holland Realty, Inc*., 574 F.3d 1084, 1088 (9ᵗʰ Cir.
2009).  The Ninth Circuit explained:

> A tying arrangement "suffer[s] *per se*
> condemnation" if a plaintiff proves:
>
> > (1) that the defendant tied together the
> > sale of two distinct products or
> > services; (2) that the defendant
> > possesses enough economic power in the
> > tying product market to coerce its

> customers into purchasing the tied
> product; and (3) that the tying
> arrangement affects a "not insubstantial
> volume of commerce" in the tied product
> market.

*Id.* at 1088-89 (quoting *Cascade Health Solutions*, 515 F.3d at
913).

### 2.   Analysis of *per se* violation of the Sherman Act.

As noted, Defendants contend § 2(c) "is a tying
agreement that is illegal *per se*, because it is imposed by a
seller with monopoly power over railroad facilities in its region
(the tying product), and railroad traffic (the tied product)."

It appears Defendants' Affirmative Defense and
Counterclaim based on tying are premised on the theory that BNSF
sells a portion of its rail line or "railroad facilities in its
region" (the tying product) only on condition that the purchaser
also buy BNSF's connecting long-haul railroad service (the tied
product) and refrain from using a BNSF competitor to move long-
haul traffic off of the line.  BNSF points out that the only
companies who buy long-haul railroad traffic services from BNSF
are shippers, and there is not any evidence in the record that
establishes BNSF possesses enough economic power in the market
for its tying product (railroad facilities in its region) to
coerce its customers to purchase the tied product (long-haul
railroad traffic services) or that shippers who purchase long-
haul railroad traffic services from BNSF are coerced into doing

29 - OPINION AND ORDER

so based on BNSF's economic power.

Defendants also do not offer any evidence as to the actual market conditions of railroad facilities in BNSF's region or that describes what the relevant market might be.  For example, Defendants do not point to any evidence in the record that describes BNSF's region, the size of the alleged region, or railroads other than UP that also operate facilities in the region.

Defendants, however, contend a court may find a tying arrangement to be *per se* illegal without inquiry into actual market conditions.  Although Defendants rely on *Jefferson Parish Hospital* to support their contention, that case makes clear a court must first find there is a "substantial potential for impact on competition in order to justify *per se* condemnation."  466 U.S. at 16.

> If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law.  It is for this reason that we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby.

*Id*.  Defendants also fail to identify any evidence in the record that indicates the Agreement's requirement that AERC use BNSF's long-haul services on the line in question causes a substantial volume of commerce to be foreclosed.

On this record, the Court concludes Defendants

30 - OPINION AND ORDER

have not established § 2(c) constitutes a *per se* violation of the
Sherman Act.

### 3.    "Rule of reason" antitrust violation.

Even if the tying arrangement is not illegal *per
se*, Defendants also assert it, nevertheless, violates the Sherman
Act because the Agreement's duration is more than five years,
which is an unreasonable restraint on trade.

> The basic method of analysis for determining
> whether an agreement is an unreasonable
> restraint on trade such as violates § 1 of
> the Sherman Act is rule of reason review, in
> which a court looks to factors such as
> specific information about the relevant
> business, the restraint's history, nature,
> and effect, and [whether the businesses
> involved have market power, with the purpose
> of distinguish[ing] between restraints with
> anticompetitive effect that are harmful to
> the consumer and restraints stimulating
> competition that are in the consumer's best
> interest.

*Cal. ex rel. Brown v. Safeway, Inc.*, Nos. 08-55671, 08-55708,
2010 WL 3222187, at *4 (9th Cir. Aug. 17, 2010)(quotations
omitted).  Defendants rely on *Shawnee Compress Co. v. Anderson*,
209 U.S. 423 (1908), and *Cincinnati, Portsmouth, Big Sandy,
Pomeroy Packet Co. v. Bay*, 200 U.S. 179 (1906), to support their
assertion that § 2(c) is an unreasonable restraint on trade.

In *Cincinnati* the Court concluded a limited
covenant in a contract for the sale of a river craft that
prohibited competing for five years in transportation between
certain points on the Ohio river did not violate the Sherman Act

31 - OPINION AND ORDER

because the restraint was not greater than the protection required by the selling party.  200 U.S. at 184-85.

In *Shawnee* the defendants and their affiliates were assembling a conglomerate that would control cotton compresses across the southern United States.  The Court found the defendants entered into the lease "in pursuance of an effort to avoid directly or indirectly the possibility, if not the probability, of unnecessary and unreasonable competition."  209 U.S. at 432.  The Court, therefore, concluded the lease violated the Sherman Act because it constituted "aid of a scheme of monopoly."  *Id*. at 434.

In *Ex Parte No. 575* the STB specifically rejected the contention that interchange commitments lasting more than five years lead to decreased competition or are likely to overcompensate the seller.

> Some shippers maintain that interchange commitments that last longer than 5 years are likely to over-compensate the seller or lessor carrier.  But a carrier considering a line sale or lease of line with traffic that makes a revenue contribution presumably calculates the net present value of the stream of revenue contribution from the traffic it would be forgoing and either (a) demands an equivalent value in the sale price or rental fee, or (b) includes interchange limiting provisions in the sale or lease. The revenue stream resulting from the agreement should be no more than what the carrier would have received had it not divested or leased the rail facilities in question, or had it demanded more in the sale price or rental fee.  So long as that is the

32 - OPINION AND ORDER

case, the interchange limiting provision
would not overcompensate the carrier and may
shift the risk of unexpected traffic loss to
the selling or leasing (Class I) carrier --
the party that was more able to assume the
risk.  We will not presume that short line
railroads, in negotiating arms-length and
voluntary contracts, are unable to protect
their own financial interests or properly
assess the value of an asset that they are
considering for purchase.  As regulators, the
Board must be very wary of the temptation to
override the determination of reasonable
compensation as negotiated by informed
private parties.

2007 WL 3170981, at *7.

Even though the STB does not have the authority to

interpret antitrust laws or to determine whether they have been

violated, the Court concludes the STB's analysis of competition

and compensation in the context of paper barriers such as the one

at issue here is informative.  As BNSF notes, there was not any

carrier who competed for the long-haul traffic to or from the

line before its sale of the line to AERC, and, therefore, the

Agreement did not produce any less competition than that which

already existed.  In addition, Defendants do not point to any

evidence in the record that indicates BNSF was motivated to sell

the line at issue to AERC by a desire to cease or to reduce

competition or that AERC was coerced into completing the

transaction.  The record reflects Defendant Root's brother

approached BNSF about selling the line, and there is not any

evidence that either he or AERC are inexperienced or incapable of

33 - OPINION AND ORDER

analyzing a rail-line purchase.  Defendants, therefore, have not
established § 2(c) violates the Sherman Act under the "rule of
reason" analysis.

      **D.    Summary**.

            In summary, the Court concludes Defendant has not
established a material issue of fact exists as to the issue
whether § 2(c) of the Agreement violates the Sherman Act either
*per se* or as an unreasonable restraint on trade.  Accordingly,
the Court grants BNSF's Motion for [Partial] Summary Judgment as
to Defendants' Affirmative Defense and Counterclaim for
violations of the Sherman Act.


                **<u>DEFENDANTS' MOTION FOR [PARTIAL] SUMMARY JUDGMENT</u>**

      As noted, BNSF alleges in its Second Amended Complaint that
AERC breached its Agreement with BNSF "by failing to pay
liquidated damages on the interchange of traffic to a railroad
other than BNSF when that traffic originated or terminated at a
facility, which before the sale was not open to rail service from
the receiving railroad."  Second Am. Compl. ¶ 25.  BNSF also
alleges fraud claims against AERC and Root personally.

      Defendants, in turn, seek summary judgment as to BNSF's
fraud claims against AERC and Root on the ground that those
claims are "restatements of [BNSF's] breach of contract claim
without any allegations of independent tortious conduct."

34 - OPINION AND ORDER

I.    **BNSF's fraud claim against AERC**

In its fraud claim against AERC, BNSF alleges in pertinent

part:

> 27.
>
> From July 1, 2004 to October 9, 2007, AERC
> fraudulently concealed that cars originating or
> terminating at a facility, which before the sale
> was not open to rail service from a carrier other
> than BNSF, were being interchanged with Union
> Pacific.
>
> 28.
>
> AERC's fraudulent concealment was intended to, and
> did in fact, defraud BNSF regarding liquidated
> damages owed.
>
> * * *
>
> 30.
>
> The Agreement obligated AERC to provide BNSF a
> monthly report of car movements that were subject
> to liquidated damages pursuant to Paragraph 2(c)
> of the Agreement.  Rather than reporting the
> interchange of cars that would be subject to
> liquidated damages, AERC caused the shipper to
> issue fraudulent waybills in order to cover up
> these movements.  BNSF relied on AERC's duty to
> disclose this rail traffic and to pay liquidated
> damages pursuant to the Agreement.
>
> 31.
>
> As a direct consequence and proximate result of
> that fraudulent concealment, AERC avoided paying
> liquidated damages in excess of $900,000.
>
> 32.
>
> In fraudulently concealing the interchange of
> cars, AERC acted with malice, or showed a reckless
> or outrageous indifference to a highly
> unreasonable risk of harm and acted with a
> conscious indifference to BNSF's welfare.
> Accordingly, BNSF is entitled to punitive damages
> in the amount of $1,000,000.

33.

From July 1, 2004 to October 9, 2007, AERC failed
to disclose that cars originating or terminating
at a facility, which before the sale were only
open to rail service from BNSF, were being
interchanged to another railroad.

34.

AERC's deceit was intended to, and did in fact,
deceive BNSF regarding its entitlement to
liquidated damages.

\* \* \*

36.

The Agreement obligated AERC to provide BNSF a
monthly report of car movements that were subject
to liquidated damages pursuant to Paragraph 2(c)
of the Agreement.  Rather than reporting the
interchange of cars that would be subject to
liquidated damages, AERC caused the shipper to
issue fraudulent waybills in order to cover up
these movements.  BNSF relied on AERC's duty to
disclose this rail traffic and pay liquidated
damages pursuant to the Agreement.

37.

As a direct consequence and proximate result of
that deceit, AERC avoided paying liquidated
damages in excess of $900,000.

38.

By intentionally deceiving BNSF regarding the
interchange of cars and the liquidated damages
that were owed, AERC acted with malice, or showed
a reckless or outrageous indifference to a highly
unreasonable risk of harm and acted with a
conscious indifference to the welfare of BNSF.
Accordingly, BNSF is entitled to punitive damages
in the amount of $1,000,000.

Second Am. Compl. ¶¶ 27-28, 30-34, 36-38.

Defendants rely on *Georgetown Realty, Inc. v. The Home
Insurance Company*, 313 Or. 97 (1992), to support their assertion
that BNSF cannot bring a fraud claim and seek punitive damages

36 - OPINION AND ORDER

against AERC because "no independent tort exists upon which liability against AERC . . . can be found."

In *Georgetown*, the plaintiff had an insurance policy with the defendant.  A third party filed a tort action against the plaintiff, and the defendant assumed the plaintiff's defense under the policy.  A jury returned a verdict against the plaintiff in the third-party action, and the defendant refused to pay the entire judgment.  The plaintiff then brought an action in state court against the defendant alleging claims for breach of contract and breach of fiduciary duty and seeking compensatory and punitive damages.  The jury returned a verdict in favor of the plaintiff on both claims and awarded punitive damages on the claim for breach of fiduciary duty.  The defendant appealed on the ground that its duties were "purely contractual," and, therefore, the trial court erred when it submitted the plaintiff's claim for breach of fiduciary duty to the jury.  *Id*. at 101-02.  The Oregon Court of Appeals held the plaintiff "did not state a claim for negligence" and remanded the case to "delete[] awards of compensatory and punitive damages on breach of fiduciary duty claim."  *Id*. at 102.  The Oregon Supreme Court reversed and noted:

> The lesson to be drawn from this court's cases
> discussing the choice between contract and tort
> remedies is this:  When the relationship involved
> is between contracting parties, and the gravamen
> of the complaint is that one party caused damage
> to the other by negligently performing its

37 - OPINION AND ORDER

> obligations under the contract, then, and even
> though the relationship between the parties arises
> out of the contract, the injured party may bring a
> claim for negligence if the other party is subject
> to a standard of care independent of the terms of
> the contract.  If the plaintiff's claim is based
> solely on a breach of a provision in the contract,
> which itself spells out the party's obligation,
> then the remedy normally will be only in contract,
> with contract measures of damages and contract
> statutes of limitation.  That is so whether the
> breach of contract was negligent, intentional, or
> otherwise.  In some situations, a party may be
> able to rely on either a contract theory or a tort
> theory or both.  *See Ashmun v. Nichols*, 92 Or. at
> 234-35, 180 P. 510 (suggesting that a plaintiff
> might be able to rely on both contract and tort
> theories).

*Id.* at 106.  Ultimately the court concluded the relationship of a

liability insurer to its insured is the "kind of relationship

[that] carries with it a standard of care that exists independent

of the contract and without reference to the specific terms of

the contract."  *Id.* at 110-11.  Accordingly, the Court concluded

the plaintiff could bring a claim for breach of fiduciary duty in

addition to a breach-of-contract claim.  *Id.* at 111.

BNSF contends *Georgetown* does not apply here because it

addresses negligent conduct or conduct based on a standard of

care whereas in this matter BNSF alleges a claim for fraud

against AERC based on intentional misconduct.  In *Georgetown*,

however, the court specifically noted "[i]f the plaintiff's claim

is based solely on a breach of a provision in the contract, which

itself spells out the party's obligation, then the remedy

normally will be only in contract, with contract measures of

38 - OPINION AND ORDER

damages and contract statutes of limitation.  That is so whether the breach of contract was *negligent, intentional, or otherwise*." *Id*. at 106 (emphasis added).  The Court, therefore, concludes the principles set out in *Georgetown* are not limited to negligence claims.

Defendants also rely on *Express Creditcorp v. The Oregon Bank*, 95 Or. App. 121 (1989).  In that case, the court reaffirmed punitive damages are generally not available in an action for breach of contract and were not available in *Express Creditcorp* for breach of contract because the defendant's counterclaim did not allege any conduct by the plaintiff that exceeded the limits of the contract.  *Id*. at 124.

Here the parties conceded at oral argument that there is not an Oregon case directly on point even though some cases touch on the issue.  For example, in *Ashmun v. Nichols*, which is cited by the court in *Georgetown,* the defendant landlord had a contract to repair the premises.  The plaintiff tenant was injured when the basement steps of the premises gave out.  92 Or. 223, 232 (1919).  The plaintiff brought a personal-injury action, and the defendant contended the action lay in contract rather than in tort.  The Oregon Supreme Court concluded the plaintiff could bring an action in tort:

> In a case like this we think that when a landlord agrees to keep his premises in repair, the law fastens upon him a duty to keep that contract, and if he violates that duty, after notice of the

39 - OPINION AND ORDER

> dangerous condition, he ought in principle to be
> liable for whatever injuries the tenant naturally
> and necessarily receives from such breach of duty.
> *If the only injury is one directly contemplated in
> the contract, as the decreased value of the use of
> the premises, the action of the tenant would be
> purely upon the contract.*  But if the negligence
> of the landlord resulted, necessarily and
> naturally, in some further injury to his person or
> property, he may bring an action, like the one at
> bar, and it is of little importance whether it is
> called technically an action on contract or an
> action upon the tort, or whether it partakes of a
> double nature, depending upon both tort and
> contract.

*Id*. at 234-34 (emphasis added).

Similarly in *Hill Meat Co. v. Sioux-Preme Packing Co.*, Civil

No. 08-1062-SU, 2009 WL 1346606 (D. Or. May 13, 2009), the

parties contracted for the sale of hogs of a certain quality.

The plaintiff alleged the defendant shipped poor quality hogs,

including hogs that were underweight or had excess fat; shipped

insufficient product; mispacked and mislabeled products; and

shipped rotten pork trim.  *Id*., at *2.  The plaintiff brought an

action alleging, among other things, breach of contract and

misrepresentation.  The court granted the defendant's motion to

dismiss the plaintiff's misrepresentation claim on the ground

that

> Hill Meat's allegations are insufficient because
> the type of harm alleged is harm caused by
> Sioux-Preme's alleged breach of the contract, not
> harm caused by Sioux-Preme's allegedly false
> representations that it had the capacity to meet
> Hill Meat's orders.  Harm caused by a breach of a
> promise is actionable through a breach of contract
> action, not a fraud claim.  *See id*. at *13.

40 - OPINION AND ORDER

> Therefore, the court should grant the motion to
> dismiss Hill Meat's claim for misrepresentation
> with leave to amend.

*Id.*, at *7.

In *International Marketing Ltd. v. Archer Daniels Midland Co.*, No. 97-1328-AS, 1998 WL 1180157 (D. Or. Apr. 10, 1998), the plaintiff agreed to purchase food products from the defendants under a number of contracts.  The plaintiff brought an action alleging, among other things, breach of contract and fraud.  The court dismissed the plaintiff's fraud claims relating to certain contracts on the ground that

> the type of harm alleged is harm caused by
> defendants' failure to ship the product, not harm
> caused by allegedly false representations that
> products were ready to be shipped.  Under the
> principles discussed above, harm caused by a
> breach of a promise to ship is actionable through
> a breach of contract action, not a fraud claim.

*Id.*, at *13.

Here, as in *Ashmun, Hill Meat Company,* and *International Marketing*, the injury alleged is one specifically contemplated by the Agreement (*i.e.*, failure to report the interchange of cars, concealment of the interchange of cars, and failure to pay liquidated damages).  The record reflects there is not any "further injury" to BNSF resulting from AERC's alleged actions beyond that contemplated under the Agreement.

Accordingly, the Court concludes BNSF's fraud claim against AERC sounds in contract, and, therefore, the Court grants

41 - OPINION AND ORDER

Defendants' Motion for [Partial] Summary Judgment as to BNSF's fraud claim against AERC.

## II.  **BNSF's fraud claim against Root**

In its fraud claim against Root, BNSF alleges:

> 46.
> From July 1, 2004 to October 9, 2007, Root was AERC's sole shareholder.  Until October of 2007, Root exclusively and  personally controlled and dominated AERC's operations and finances.  Root fraudulently concealed and engaged in deceit by failing to disclose that cars originating or terminating at a facility, which before the sale were only open to rail service from BNSF, were being interchanged to Union Pacific.  Root engaged in this scheme in order that AERC could avoid paying the liquidated damages to BNSF so that money due to BNSF could be pilfered by Root.

> 47.
> Root perpetrated this artifice by causing fraudulent waybills to be issued for the traffic on which liquidated damages were owed.  As principal Root used AERC as his agent to commit and cover up this fraud.

> 48.
> As a direct consequence and proximate result of Root's wrongful conduct, AERC avoided paying BNSF liquidated damages in excess of $900,000.  The division of revenues received from the prohibited interchange movements was diverted to Root, and as a result of the inadequate capitalization and milking of corporate assets, AERC is no longer capable of satisfying corporate liquidated damages liability to BNSF.  Root's controlling and fraudulent conduct jeopardizes BNSF's ability to seek recovery against AERC.

> 49.
> By intentionally and personally deceiving BNSF regarding the interchange of cars and the liquidated damages that were owed and by using AERC as an agent to perpetrate and conceal the scheme, Root acted with malice, or showed a

42 - OPINION AND ORDER

> reckless or outrageous indifference to a highly
> unreasonable risk of harm and acted with a
> conscious indifference to the welfare of BNSF.
> Accordingly, BNSF is entitled to punitive damages
> in the amount of $1,000,000.

Second Am. Compl. ¶¶ 46-49.

It is undisputed that "[f]or non-disclosure to form the basis of a fraud claim, defendant must be under a duty to disclose." *Paulsell v. Cohen*, No. 00-CV-1175-ST, 2002 WL 31496397, at *24 (D. Or. May 22, 2002)(citing *Gebrayel v. Transamerica Title Ins. Co.*, 132 Or. App. 271, 281 (1995)). In addition, a claim for fraud by actual concealment requires the active concealment to be perpetrated by a party to the transaction. *Id.*, at *25 n.12 (The plaintiff "cannot be held liable based on a theory of concealment simply because he was not a party to the TRM/ReadyCash LP transaction. A fraud claim based on a theory of concealment requires that the defendant be a 'party' to the transaction at issue."). *See also United States Nat'l Bank of Oregon v. Fought*, 291 Or 201, 219 n. 15 (1981)(in an action for fraud by a lender against the accountants of the borrower, the court noted "§ 550 is concerned with the relationship between the parties to a transaction. Defendants were not a 'party' to the transaction with plaintiff. We doubt the applicability of § 550.").

Here Defendants contend BNSF may not bring its fraud claim against Root because BNSF has not established that Root had any

independent duty to report the interchange of cars, the concealment of the interchange of cars, or the failure to pay liquidated damages.  The Court agrees.

BNSF, however, cites a number of cases to support its contention that Root may be held liable in fraud for either failing to disclose or actively concealing the interchange of cars.  Each of those cases, however, involve fraud claims against parties to the transactions at issue.  Here the record reflects Root was not a party to the Agreement, which was between AERC (before Root owned AERC) and BNSF.  To the extent that BNSF seeks to hold Root personally liable for his alleged failure to disclose or for his active concealment of the interchange of cars, BNSF's fraud claim appears to be a part of its claim against Root for misrepresentation/piercing the corporate veil.

Accordingly, the Court grants Defendants' Motion for [Partial] Summary Judgment as to BNSF's fraud claim against Root.


### BNSF'S MOTION TO FILE THIRD AMENDED COMPLAINT

At oral argument BNSF attempted to rely on representations allegedly made by Defendants before the STB as a basis for its fraud claims against AERC and Root.  At that time the Court noted BNSF had not included these allegations or issues in its Second Amended Complaint or, in fact, in any Complaint filed in this Court.  BNSF conceded it raised these allegations and issues as a

44 - OPINION AND ORDER

basis for its fraud claims for the first time in its Memorandum in Opposition to Defendants' Motion for [Partial] Summary Judgment.  BNSF also conceded it did not advise Defendants that it intended to make these allegations or raise these issues before filing its Memorandum in Opposition.  On July 16, 2010, BNSF filed a Motion to File Third Amended Complaint in which it seeks to additionally support its fraud claims by including allegations as to Defendants' alleged representations before the STB.

The Court, however, notes fact discovery in this matter closed on October 16, 2009 and BNSF was aware of the facts and issues that it seeks to include in a Third Amended Complaint well before Defendants filed their Motion for [Partial] Summary Judgment on February 2, 2010.  Nonetheless, BNSF has not adequately explained its failure to seek to amend its Second Amended Complaint before the Court heard oral argument in July 2010.

Accordingly, in the exercise of its case-management discretion to move this matter toward resolution, the Court denies BNSF's Motion to File Third Amended Complaint.


## CONCLUSION

For these reasons, the Court **GRANTS** BNSF's Motion (#81) for [Partial] Summary Judgment, **GRANTS** Defendants' Motion (#85) for

45 - OPINION AND ORDER

[Partial] Summary Judgment, **DENIES** BNSF's Motion (#105) to File a Third Amended Complaint, **DISMISSES** BNSF's fraud claims against AERC and Root, and **DISMISSES** Defendants' Fifth through Ninth Affirmative Defenses and all of Defendants' Counterclaims.

The Court notes all previously set case-management dates were stricken to accommodate oral argument and post-hearing briefing regarding the Motions resolved in this Opinion and Order. Thus, the Court will set a new schedule for the filing of the proposed Pretrial Order and a proposed form of verdict; the filing of the trial papers necessary for the Court to conduct the Pretrial Conference; the Pretrial Conference; and a jury trial. The Court directs trial counsel to confer and to propose jointly **no later than September 27, 2010**, a schedule convenient to the parties, including at least two alternative trial settings for the Court's consideration.

IT IS SO ORDERED.

DATED this 20th day of September, 2010.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District